United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ADROA ANDERSON,

    Plaintiff,

v.

BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, JOHN LAWS, SCOTT BUCKOVIC, and KEITH BENDIXEN,

    Defendants.

No. C 19-06997 WHA

**ORDER RE MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this Section 1983 action for unlawful conduct by law enforcement, defendants move for summary judgment on individual and *Monell* claims. For the reasons that follow, summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

The following facts are uncontroverted. On Christmas night, 2017, plaintiff Adroa Anderson drove his Jeep to an ATM on the San Jose State University Campus, in San Jose, California. He, an African-American man, was unfamiliar with the area (Crowley Decl. Exh. G at 15, 25, 31, 51).

1     Anderson parked his Jeep in front of the ATM, which was located on school property in a
2 plaza. Only service and emergency vehicles could lawfully drive on the plaza. Close to the
3 ATM, however, lay a parking lot accessible from the public street. No curb, lip, or raised
4 indicators separated the parking lot from the pedestrian-only plaza. No evidence has been
5 provided that the area around the ATM, which included the confluence of a walkway, the
6 Ninth Street access road, and a parking lot, had signs warning that cars could not drive on the
7 plaza. As seen below, the parking lot's surfacing appeared gray while the plaza's appeared
8 paler (Crowley Decl. Exhs. F (below); D at 25, 27; E at 32).



22     San Jose State University Sergeant John Laws noticed Anderson, stopped his patrol car,
23 began to approach Anderson, and switched on his body-worn camera (Hamoy Decl. Exh. 2 at
24 43–44).
25     Officers' body-worn cameras captured the exchange that came next. Laws approached
26 Anderson. Laws quizzed Anderson about whether Anderson knew where he was (Hamoy
27 Decl. Exh. 3 at 00:50–00:53).

Anderson explained that he had not realized he had driven into a pedestrian zone. Laws countered that Anderson was on a "sidewalk" and asked if he had been drinking. Anderson denied drinking. Laws used his radio to call in what sounded like a request. Anderson offered: "I didn't realize. I came from this direction." Saying this, he pointed toward the parking lot, behind himself and to the side of the ATM. Laws next asked for Anderson's driver's license, Anderson asked why, and Laws repeated, "You're driving on the sidewalk, that's illegal." Anderson asked if he would be given a ticket. Laws said yes. Anderson said, "All right," and handed over his license. He explained that he was not from San Jose, and that he had not seen any partition between the lot and the plaza. Anderson's demeanor was normal. He spoke calmly and clearly. He stood still, without losing his balance (*id*. at 00:53–01:40).

Laws asked whether Anderson had consumed "pot" or if he was under the influence of anything else. Anderson answered "no." Then, Laws asked him to perform a nystagmus test, which is one of a battery of exams generally called field sobriety tests (FSTs): "Can you watch my finger just with your eyes . . . ?" Anderson responded, "I'm not doing that." Laws replied, "Ok, then I can't let you drive away." After Laws provided information to dispatch, Corporal Scott Buckovic can be seen pulling up. Laws next shone his flashlight into the Jeep's closed window and then returned to speak with Anderson. Laws told him, "Ok, sir, I'm really kind of thinking you're impaired." Anderson repeated, "I don't want to answer questions." Laws told him, "You couldn't figure out that you're on the sidewalk, um, so if you don't let me go ahead with tests, then I'm going to go ahead and base it on what you've given me, which is almost nothing other than your disorientation, [and] your inability to differentiate between the street and the sidewalk . . ." (*id*. at 01:40–04:50).

Anderson and Laws debated whether Anderson's confusion about the legality of driving on the plaza implied disorientation or poor urban planning. (Laws: "Ok but you can tell the difference between a sidewalk and a roadway, correct?" Anderson: "Not when there's, like, there's no leveling difference . . . I could not.") Laws concluded, "So, you refused to provide me any investigative leads to try and figure out if you're impaired or not." Anderson objected, "I don't respond to condescending questions." Laws asked one additional question, "What

3

brings you down here tonight?" Anderson repeated, "I don't answer these questions, sir," and added, "I'm not answering excessive questions." Laws responded: "If you could go ahead and put your hands behind your back for me, we're going to go ahead and take you into custody for driving under the influence." Anderson announced he would be making a complaint against Laws but complied (*id.* at 04:54–05:50).

Next, Buckovic gave Anderson a pat-search and Laws searched Anderson's Jeep. Anderson called out that he did not give consent to search the car. Laws located prescription pill bottles made out to Anderson on the passenger side of the Jeep (*id.* at 05:56–09:05).

Officers captured portions of the remaining events on their body-worn cameras. Laws performed a quick drug test on the tablets, which returned a positive result for methamphetamine. After arriving at the station, Anderson continued to ask why he was being detained, and to argue that he was not impaired. Anderson indicated that he would submit to FSTs if a different officer administered them. Officer Keith Bendixen, who had not been present earlier, administered the FSTs. After the tests, of which (officers contend) Anderson passed three and failed two, Bendixen and Anderson spoke at some length. Eventually Bendixen told Anderson (Crowley Supp. Decl. Exh. A at 01:17–01:29):

> But I guarantee, you would have been a lot better if you were just **cool with your mouth from the start.** You know what I mean? I think that's what kind of caused all this stuff, you know what I mean?

(The parties do dispute the phrase in bold, as discussed below.) Anderson was eventually released. Anderson's tablets were sent for re-testing. They came back negative for illegal substances. No charges were ever filed.

Defendants, individual officers and the Board of Trustees of the California State University, now move for summary judgment. This order follows full briefing, responses to an order requesting clarification, oral argument, and supplemental briefing.

**ANALYSIS**

Summary judgment is proper where the admissible evidence demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

4

of law." FRCP 56(a).  In the instant motion, defendants move to dismiss all claims, which allege, under Section 1983, Fourth Amendment violations for arrest, search, and excessive force, and a Fourteenth Amendment violation due to race discrimination.  Defendants also move to dismiss the *Monell* claim.

> **1.    FOURTH AMENDMENT AND QUALIFIED IMMUNITY.**

This order finds that while officers violated Anderson's Fourth Amendment rights, qualified immunity shields them.  Where officers assert qualified immunity, a Section 1983 analysis generally proceeds in two steps.  *First*, a district court determines whether a violation of a constitutional right occurred.  *Second*, if so, the court determines whether the plaintiff's right to be free from official action "was clearly established." *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020).  If the right was not clearly established, qualified immunity shields official defendants.  *See ibid*.  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (cleaned up).

Defendants assert that officers possessed reasonable suspicion for a stop.  On the papers, Anderson does not contest reasonable suspicion of the traffic violation.  Defendants also assert that officers possessed probable cause for an arrest under California Vehicle Code Section 23152(f).  This order finds that a reasonable jury could disagree.  Probable cause requires more than a hunch, but less than "conclusive evidence of guilt." *Ramirez v. City of Buena Park,* 560 F.3d 1012, 1023 (9th Cir. 2009).  "[M]ere suspicion, common rumor, or even strong reason to suspect are not enough." *Ibid*.  This order must evaluate not what Laws thought of probable cause, but what a reasonable officer would have believed under these circumstances.  *See Gordon v. Cty. of Orange*, 6 F.4th 961, 965 (9th Cir. 2021).  Where probable cause exists, "[s]ubjective intentions play no role . . . ." *Whren v. United States*, 517 U.S. 806, 813 (1996).

Vehicle Code Section 23152(f) prohibits driving while impaired by drugs.  Parties agree that the arrest occurred upon handcuffing, so this order considers the facts then known to the arresting officer.  *See John v. City of El Monte*, 505 F.3d 907, 911 (9th Cir. 2007).

5

Defendants claim probable cause to arrest for driving under the influence (DUI), based on the following observations of drug intoxication (Opp. Br. at 3, 7; Reply Br. at 7; Hamoy Decl. Exh. 2 at 51–54, 59–61):

> *First*, Plaintiff had committed a traffic violation by driving from the parking lot onto the pedestrian walkway. *Second*, Plaintiff appeared disoriented and could not explain how he ended up parking on the pedestrian walkway. *Third*, Plaintiff refused to perform any field sobriety test to demonstrate whether or not he was safe to drive.

*First*, as to the traffic violation, the undisputed record clearly shows that the plaza lacked signs or a curb indicating that it had begun, or that it only served pedestrians. "[We] can appropriately recognize certain driving behaviors as sound indicia of drunk driving," such as "weaving all over the roadway," "cross[ing] over the center line," and "driving in the median." *Navarette v. California*, 572 U.S. 393, 402 (2014) (citing cases). The same logic applies for drug DUI. "Of course, not all traffic infractions imply intoxication." For example, "reports of driving without a seatbelt or slightly over the speed limit" do not support reasonable suspicion of driving under the influence. *Ibid*. Laws knew that it was nighttime (therefore difficult to see); that Anderson had never visited the ATM before; and that the plaza lacked signs, curbs, or rumble strips. Furthermore, ATMs directly abut parking lots in the vast majority of American strip malls. This suggests that the area's layout was simply confusing. Driving a very short distance into the pedestrians-only plaza did not provide suspicion of intoxication.

*Second*, Anderson's purported "disorientation" did not amount to an objective sign of intoxication. Our court of appeals has approved a chorus of symptoms as evidence of drug DUI: "[u]ncontrollable sleepiness"; "irritability and rapid breathing"; a quickened heart rate; at least one failed FST; and a less-than-believable explanation that the defendant was napping in his car even though his home lay a mile away. *Ramirez,* 560 F.3d at 1023. If Anderson appeared confused or disoriented at any time on Laws' video, it came at the outset of the encounter, in response to Laws' confusing first question (Br. at 8; Hamoy Decl. Exh. 3 at 00:33–00:58):

> Laws: Where are you at?

6

> Anderson: I don't understand.
>
> Laws: You drove this, right?
>
> Anderson: Where are we going? I — I came to the ATM (gestures at the ATM).
>
> Laws: Ok, look down. What does that look like?
>
> Anderson looks down: What do — [shrugs] can you just get to the point? Like, I don—.
>
> Laws: You're on the *sidewalk*.
>
> Anderson: I didn't realize. I came from this direction (pointing to the parking lot).

*Third*, the refusal to perform FSTs may be held against a suspect in the absence of an affirmative right to refuse and in the absence of coercion, the Fifth Amendment notwithstanding. In *South Dakota v. Neville*, 459 U.S. 553, 564 (1983), the Supreme Court held that performing an FST "after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination. . . ." Neither an affirmative right to refuse nor coercion here appear. Nevertheless, absent other signs of intoxication, Anderson's refusal to do the nystagmus test did not evince guilty conscience. This record does not support a reasonable inference that Anderson refused due to intoxication and a desire to get away with DUI. *See Price*, 200 F.3d at 1248; *Cf. Bochner v. Munoz*, 2013 WL 1087818, at *3 (E.D. Cal. Mar. 14, 2013) (Judge Carolyn K. Delaney) (*report and recommendation adopted,* 2013 WL 5708622 (E.D. Cal. Oct. 11, 2013)) (smell of alcohol plus refusal of FST supported arrest). (This order does not rely on the medications seized from the Jeep because the relevant facts are those known to the officer at the time of the arrest. Laws searched the Jeep and found the medications after the arrest.)

Officers violated the Fourth Amendment when they arrested Anderson for this conduct. Defendants do not argue that any probable cause independently existed to search the car, nor does the right to search the car stem from search incident to arrest or the need to inventory the Jeep. Thus, officers also violated the Fourth Amendment by searching the Jeep. Finally, however, Anderson does not oppose summary judgment on excessive force, so defendants are entitled to summary judgment on liability for excessive force.

7

These conclusions do not end the inquiry. Anderson does not identify (nor has this Court identified) controlling authority with similar facts that militates in Anderson's favor. *Cf. Ramirez,* 560 F.3d at 1024. Citing *Vohra v. City of Placentia*, 683 F. App'x 564, 566 (9th Cir. 2017), Anderson argues that when the record viewed in the light most favorable to the nonmoving party lacks evidence of a critical element of the offense (here, presumably, evidence of intoxication), this order must deny summary judgment on qualified immunity. Yet *Vohra* is unpublished and, furthermore, Anderson has failed to provide a case on point that found no probable cause for intoxication under these circumstances. He has also failed to provide a case showing that the search was plainly unlawful; in fact, an officer might have reasonably believed that the arrest gave them the right to conduct an inventory search.

Next, Anderson argues that if the law was clearly established, a factual parallel is not required. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013). Given recent Supreme Court rulings involving the Fourth Amendment and qualified immunity, this order remains convinced that a close factual precedent would be required to overcome qualified immunity. *See Rivas-Villegas v. Cortesluna*, No. 20-1539, 2021 WL 4822662 (U.S. Oct. 18, 2021); *City of Tahlequah, Oklahoma v. Bond*, No. 20-1668, 2021 WL 4822664 (U.S. Oct. 18, 2021).

Summary judgment is, on liability for the excessive force claim, **GRANTED** to all defendants. Qualified immunity on all other Fourth Amendment claims must be **GRANTED** to the individual defendants.

### 2. THE EQUAL PROTECTION CLAUSE.

The equal protection claim against Laws will go to a jury. Defendants did not specifically discuss summary judgment on this claim in their initial motion, though they moved for entry of judgment on all claims in their favor (Br. at 7). But, due to Anderson's failure to object, briefing from both sides on this claim after an order seeking clarification, and vigorous debate on this topic at the hearing, this order will reach the issue.

Where no Fourth Amendment violation appears, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause . . . ." *Whren*,

8

517 U.S. at 813. A qualified immunity defense does not apply as to the equal protection claim because, "The right to non-discriminatory administration of" policing "is clearly established." *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010); *see also Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980). In any case, defendants do not claim qualified immunity as to the equal protection claim.

A reasonable jury could find that Bendixen's statement supplied an inference that Laws reacted to Anderson's argumentativeness and arrested him at least in part because of Anderson's race. "To state a claim under [Section 1983] for a violation of the Equal Protection Clause of the Fourteenth Amendment[,] a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan,* 705 F.3d 1021, 1030 (9th Cir. 2013). Discriminatory intent may be proven by direct or circumstantial evidence. *See Washington v. Davis,* 426 U.S. 229, 239–40 (1976).

The parties dispute a portion of Bendixen's statement. Anderson proposes, "**cool with your mouth from the start**" while defendants contend that the phrase was, "**cool with him out at the stop**" (Surrep. Br. at 1). The Court listened to the recording during the telephonic hearing. A reasonable jury could conclude that Bendixen said "cool with your *mouth* from the start" (Crowley Supp. Decl. Exh. A at 01:17–01:29; Crowley Decl. ¶ 6, emphasis added).

Anderson argues, "Bendixen's statement implies that Anderson was the victim of the subjective whim of Defendants' enforcement of California Vehicle Code Section 23152. This is classic, direct evidence of an improper motive for questioning, arrest and detention based upon Anderson's race" (Opp. Br. at 14). Defendants contend that the statement is race-neutral, irrelevant under Rules 401 and 402, inadmissible under Rule 602, and, anyway, Bendixen was absent from the arrest (*id.* at 2).

This order finds instructive *Price v. Kramer*, 200 F.3d 1237, 1242–43, 1251 (9th Cir. 2000). In the events precipitating that Section 1983 suit, an officer stopped two young African-American men on thin allegations of non-moving traffic violations. The stop occurred after they drove into a primarily white neighborhood. He told them, "You look like you have

something on the tip of your tongue that you want to say, why don't you say it?"; "What are you doing out here?"; "You're not supposed to be here"; and "[G]et the hell out of here." The young men sued. Defendants defeated the equal protection claim at a jury trial, but in light of the officers' statements (and absence of similar statements to the white boy with them), the district court granted plaintiffs' post-trial motion and entered judgment for the plaintiffs. Our court of appeals approved. Though our facts appear less egregious, the remedy Anderson seeks is correspondingly less extraordinary: Anderson only wants a jury trial.

Viewing the record in the light most favorable to Anderson, as we must, it is plausible that Bendixen learned about the encounter from Laws. The parties conceded at the hearing that the record is silent on this point. Bendixen's statement, a reasonable jury could find, meant that Laws shared details of the events with Bendixen, which details suggested that Laws arrested Anderson due to not being cool with his mouth, meaning a Black shouldn't talk back like that to an officer. Contrary to defendants' arguments, this interpretation of the statement is nonspeculative and is relevant to the equal protection claim. Of course, a jury could also find that no racial animus was intended. At summary judgment, all that is required is that a fact-finder could draw a reasonable inference, a possibility which here exists. A jury must decide the ultimate question. Summary judgment on the equal protection claim is, as to Laws, **DENIED**.

Bendixen and Buckovic, however, moved for judgment in their favor on all claims (Br. at 6). Anderson raised no objections about whether defendants adequately developed their argument for summary judgment on the Fourteenth Amendment claim. Finally, Anderson did not develop any argument in opposition to summary judgment on the equal protection claim as to the pair. Summary judgment on the equal protection claim as to Bendixen and Buckovic is therefore **GRANTED**.

3. *MONELL*.

While municipalities are not subject to qualified immunity, the Board of Trustees is entitled to summary judgment as to the Fourth Amendment violation because no evidence of a policy, custom, practice, failure to train, or ratification, appeared. The primary policy

10

mentioned comes from California Police Officer Standards and Training (Crowley Decl. Exh. B. at 9–10). Anderson has not, however, introduced evidence to suggest that the Board adopted it. "The inadequacy of police training may" also "serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Price v. Sery,* 513 F.3d 962, 973 (9th Cir.2008), quoting *City of Canton v. Harris,* 489 U.S. 378, 388 (1989) (cleaned up). Anderson cites *Irwin v. City of Hemet*, 22 Cal. App. 4th 507 (1994), for the proposition that defendants must produce some affirmative evidence of training to defeat a failure-to-train theory at summary judgment. There, however, the defendants lost at summary judgment because they argued that the complaint had inadequately alleged causation between a municipal policy and the harm (and they were wrong). *Id*. at 527. Here, defendants have pointed to a record that lacks evidence of "deliberate indifference," a critical element of a failure-to-train *Monell* claim. Anderson has failed to introduce evidence of inadequate training sufficient to generate a genuine material dispute.

The *Monell* claim also fails as to the equal protection claim for lack of an identified policy, procedure, or failure to train (Opp. Br. at 21). Summary judgment is **GRANTED** on the *Monell* claim.

## CONCLUSION

Anderson's equal protection claim under the Fourteenth Amendment may proceed to trial against Laws. Summary judgment is **GRANTED** to defendants on the remaining claims.

**IT IS SO ORDERED.**

Dated: October 29, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE